## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF OHIO
## EASTERN DIVISION

**SHARI S. DRERUP,**

        **Plaintiff,**      **:**

                              **Case No. 2:19-cv-3499**

    **v.**                          **Judge Sarah D. Morrison**

                              **Magistrate Judge Kimberly A.**
                              **Jolson**

**NETJETS AVIATION, INC.,**      **:**

        **Defendant.**

## OPINION AND ORDER

This matter is before the Court on Defendant NetJets Aviation, Inc.'s Motion for Summary Judgment. (Mot., ECF No. 45.) NetJets argues there are no genuine issues of material fact in the case brought by Plaintiff Shari S. Drerup for sex discrimination. (*Id.*) Ms. Drerup opposed (Opp., ECF No. 52), and NetJets replied (Reply, ECF No. 54). This Motion is ripe for consideration.

For the reasons set forth below, NetJets' Motion is **GRANTED.**

## I.    FACTUAL BACKGROUND

Ms. Drerup was hired in December 2016 by NetJets, a private aviation company specializing in management of fractional and shared aircraft. (Drerup Am. Decl. ¶ 2, ECF No. 55-1; Kennedy Aff. ¶ 2, ECF No. 45-1; Answer ¶ 5, ECF No. 22.) At the time she was hired, Ms. Drerup was a pilot type rated in five aircraft, including two that were in NetJets' fleet—the Citation Encore+ and the HS-125 Hawker 800/900. (Drerup Dep. 19:15–20:11, ECF No. 45-3.)

Pilots hired by NetJets are subject to a one-year probationary period.

(Kennedy Dep. 37:13–14, ECF No. 45-10.) NetJets' Director of Training, Sean Kennedy, characterized this period as "an extension of their interview." (*Id.*)

### A. Indoc Training and Aircraft Assignment

When a pilot is hired, he or she must first complete indoctrination ("Indoc") training, which includes review of company policies, safety protocols, operating principals, and other company-related information. (Drerup Dep. 28:6–12.) Ms. Drerup's Indoc training class was comprised of ten men and three women. (ECF No. 52-1, PageIDs 726–27.)

Despite her successful completion of Indoc training, Mr. Kennedy testified that concerns were raised about Ms. Drerup during the training. (Kennedy Dep. 29:21–30:1, 30:12–19.) Specifically, Christopher Eastman, then Assistant Director of Training and Standards, reported that his interactions with Ms. Drerup left him with a "very strong impression" that her demeanor "was not aligned" with his expectations of the level of service NetJets requires for its pilots. (Eastman Dep. 10:2–5, 110:1–5, ECF No. 45-6.) And Janessa Krause, Project Manager of Training and Standards for NetJets, did not feel Ms. Drerup's behavior displayed the level of professionalism and engagement that NetJets expects of its pilots. (Krause Dep. 8:24–9:1–2, 21:14–20, ECF No. 45-7.) For her part, Ms. Drerup disputes that the "concerns" were raised during her Indoc training, offering evidence that these concerns were not documented until February 28, 2017, the day Ms. Drerup failed her check ride. (ECF Nos. 52-3, 52-3.)

After Indoc training, Ms. Drerup was assigned to the Phenom 300 fleet. (Drerup Dep. 30:7–16.) Three male pilots were reassigned to another aircraft, the

Citation Encore+, after a "fit test" determined they were unable to fit safely and comfortably within and operate the Phenom based on their measurements.[1] (ECF No. 52-1, PageIDs 726–27; Kennedy Dep. 12:12–13:24.) According to Ms. Drerup, "[a] fourth pilot requested to be placed in another plane and his request was granted," but does she not elaborate or explain the relevance of this pilot to her claims. (Opp. PageID 698; Drerup Am. Decl. ¶ 26.)

### B. FlightSafety International Simulator Training

Once assigned to an aircraft, NetJets pilots are provided flight simulator training by FlightSafety International Inc. ("FSI"). At FSI, Federal Aviation Administration ("FAA")-certified flight instructors take the pilots through a series of training exercises for their aircraft. (Queen Dep. 50:21–52:13, ECF No.45-8.) A Phenom pilot engages in seven simulator sessions in a normal training experience, and each session covers a specific set of skills or maneuvers that the pilot must be able to perform. (Drerup Dep. 35:13–16, 37:6–12, 37:22–38:1.)

FSI Instructors use a four-point grading scale to evaluate pilots on each

---

[1] Neither party really explains the fit test, but it seems the test determines whether pilots meet certain size dimensions to fly the Phenom aircraft; if a pilot is outside these size dimensions, he or she is not assigned to the Phenom and is assigned to another aircraft. (*See* Mot. PageID 194; Kennedy Dep. 12:12–13:21.) The parties use the terms "assigned," "not assigned," "reassigned," "moved," and "transferred" when discussing the fact that these male pilots were not flying the Phenom. (*See, e.g.*, Mot. PageID 194 ("Pilots who exceed certain size dimensions are not assigned to the Phenom because they cannot fit comfortably in the cockpit"); Opp. PageID 706 ("Ms. Drerup identified three male pilots who were reassigned from the Phenom to other planes because of their stature.")) Viewing the evidence in a light most favorable to the non-moving party as it must, the Court assumes that these pilots were at one point "assigned" to the Phenom before being "reassigned" to another aircraft.

required skill or maneuver. (ECF Nos. 50, 51.) A "1" indicates proficient; a "2" indicates normal progress; a "3" indicates needs additional training; and a "4" indicates unsatisfactory. (*Id.*) A pilot must be graded proficient in all maneuvers to be recommended for a check ride. (Queen Dep. 54:2–4; ECF Nos. 50, 51.) During the check ride, there are 25–30 maneuvers pilots have to complete, and the FAA requires a pilot successfully complete all maneuvers during the check ride before he or she begins to fly. (Queen Dep. 53:15–18.)

Ms. Drerup received ratings of "3" on twelve separate occasions during her simulator training. (Mot. PageID 191; ECF No. 50.) Of the other pilots training in the Phenom simulator at the same time as Ms. Drerup, only one received scores of "3" during his simulator training sessions. (*Id.*; Drerup Dep. 60:11–14; ECF No. 51.) Grades of "3" are unusual: "In fact, when you see a grade of 3 on a Flight Training Record, what that means is that they are not good—it doesn't just mean that they're going to need additional training. It means they're going to need additional training outside of the footprint of the course." (Eastman Dep. 120:6–11.)

Ms. Drerup struggled with single engine operations during simulator training. Specifically, she had difficulty pushing the aircraft rudder pedal to the floor when one of the engines stopped working—this is a serious safety issue because if the rudder is not to the floor, the plane can roll to the side of the nonworking engine and crash. (Messenger Dep. 56:2–21, ECF No. 45-4.) During her seventh simulator training, Ms. Drerup's trainer, Boyd Ashley Messenger, told her that her legs were too short to fully reach the floor with the rudder pedals to control

the airplane during single engine operations. (Drerup Dep. 66–67; Messenger Dep. 39:2–17; Felton Dep. 26, ECF No. 49-1; Drerup Am. Decl. ¶ 46.) Ms. Drerup, who is 62 inches tall, testified that "Mr. Messenger was telling me that I was struggling because I just wasn't tall enough to reach the rudder to full deflection." (Drerup Dep. 13:10–11; 67:10–13.) Mr. Messenger gave her an unsatisfactory evaluation, which concludes: "Shari's stature precludes attaining sufficient control authority." (ECF No. 52-9.) Ms. Drerup expressed concern that it was not safe for her to fly the Phenom to Mr. Messenger and another pilot in charge of the Phenom training program, Leon Lambert. (Derup Am. Decl. ¶ 56.) She also testified during her deposition that she was too short to safely the Phenom. (Derup Dep. 68:15–17.)

Ms. Drerup struggled with other maneuvers too during simulator training. (ECF No. 50.) For example, Ms. Drerup received "3"s on February 18th and 21st in the "Circling Approach and Landing" maneuver, which did not relate to the engine out maneuver. (*Id.* PageID 678; Drerup Dep. 51:8–16.) Notes associated with the "3" score read: "Did ok with some coaching. Still struggling a little bit with situational awareness." (ECF No. 50, PageID 682.) Situational awareness relates to a pilot's awareness about where an aircraft is located in relation to, for example, the airport. (Drerup Dep. 53:23–54:6.) She also received scores of "3" in three other maneuvers unrelated to the engine out maneuvers. (*Id.* PageIDs 678–79; Drerup Dep. 51:1–7; 52:2–10.) Ms. Drerup argues, however, that all of her struggles stem from her problems with the engine out maneuver and maintaining control of the plane—"it affect[ed] every procedure, every maneuver, every approach that [she did]." (Drerup

Dep. 58:21–59:8.)

After the seventh simulator session, Ms. Drerup spoke to Jim Queen, NetJets' Senior Director of Training. He told her to do whatever she needed to do to pass the check ride, including getting a booster seat or platform shoes. (Drerup Am. Decl. ¶ 57; Queen Dep. 69:1–4, 24, 70:1–10.) Ms. Drerup told Mr. Queen she was type rated in two other NetJets aircraft, but Mr. Queen replied that, if she was too short to fly the Phenom, then she was too short to fly NetJets' other planes, so she had to "[m]ake the Phenom work." (Drerup Am. Decl. ¶ 57.)

During his deposition, Mr. Queen explained that there are a "combination of things that a shorter stature [pilot] could do," including using pillows or larger soles on his or her shoes. (Queen Dep. 70:4–10.) In fact, Ms. Drerup was "not the only pilot that [NetJets has] that is of shorter stature." (*Id.*) NetJets has a female pilot that is 62 inches tall and another that is 63 inches tall, both of whom are flying the Phenom. (ECF 54-1, PageID 801.)

Despite her safety concerns, after her conversation with Mr. Queen, Ms. Drerup bought thick soled shoes and brought pillows to use during two additional training sessions—though the pillows "put [her] up too high." (Opp. PageID 703; Drerup Dep. 85:15–86:2; ECF No. 50.) Mr. Lambert and Mr. Messenger also gave her seat positioning suggestions to accommodate her short stature. (Messenger Dep. 49:17–50:15.) With these changes and the additional training, Ms. Drerup achieved proficiency in all maneuvers and was recommended for a check ride. (*Id.*; ECF No. 50.) Mr. Messenger explained that "after [] seat positioning mitigation, she was able

6

to perform [the engine out] maneuver to standard, and she was repeateable."
(Messenger Dep. 52:1–3.) Ms. Drerup, however, says she was not proficient at the
end of the simulator training—explaining it was a "struggle" to perform the engine
out maneuver and that she "might get [the maneuver] once in a while if the stars
aligned." (Opp. PageID 717.)

### C. The Check Ride

The final training step at NetJets is the check ride. When a pilot performs a
maneuver out of standard during a check ride, the pilot has the choice to stop the
check ride completely or to continue and complete the remaining maneuvers. If the
pilot chooses to continue, the pilot will only be required to perform any
unsatisfactory maneuvers in a subsequent check ride. (Queen Dep. 55:14–56:8.)

Ms. Drerup's check ride was on February 28, 2017, at which time she failed to
perform an engine out on the missed approach maneuver within the acceptable
standard of performance. (Drerup Dep. 99:23–100:9; Lambert Dep. 80:8–10, ECF
No. 45–9.) Ms. Drerup chose not to continue her check ride after she performed the
engine out maneuver unsatisfactorily, stating she felt she could not succeed due to
her height. (Drerup Dep. 113:24–114:4.)

Ms. Drerup declined additional training after she failed her check ride. (*Id.*
114:14–16.) She says that additional training would have been futile because she
"was too short to safely fly this airplane." (*Id.* 114:3–4.)

### D. The Decision to Terminate

Ms. Drerup's employment with NetJets was terminated on March 1, 2017,
the day after she finished her check ride. (ECF No. 52-11.) NetJets says it

terminated Ms. Drerup for several reasons: (1) she failed her check ride and chose not to continue; (2) she declined the opportunity to receive additional training to help her satisfactorily complete her check ride; (3) there were concerns regarding Ms. Drerup's demeanor during Indoc training; and (4) her flight training record showed she had significant struggles. (Kennedy Dep. 44:6–22; Kennedy Aff. ¶ 9.)

## II.     PROCEDURAL BACKGROUND

Ms. Drerup filed a charge of discrimination with the Equal Employment Opportunity Commission and received a Right to Sue Letter in May 2019. (Compl. ¶¶ 32–33, Ex. 1, ECF No. 1.) She filed suit in this Court against Defendants NetJets and Jim Queen in August 2019, (Compl.), and subsequently amended her complaint (Am. Compl., ECF No. 7), before dismissing Mr. Queen was later dismissed without prejudice[2] (ECF No. 9). Following discovery, NetJets filed this Motion for Summary Judgement, which is now ripe for review.

## III.     STANDARD OF REVIEW

Summary judgment is appropriate when "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The movant has the burden of establishing there are no genuine issues of material fact, which may be achieved by demonstrating the nonmoving party lacks evidence to support an essential element of its claim. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322–23 (1986); *Barnhart v. Pickrel, Schaeffer & Ebeling Co.*,

---

[2] Ms. Drerup brought Count III only against former-Defendant Jim Queen for aiding and abetting sex discrimination under Ohio Rev. Code § 4112.02(J). Accordingly, Claim III is **DISMISSED** without prejudice. (Mot. PageID 193 n.1; Opp. PageID 705; ECF No. 7.)

12 F.3d 1382, 1388–89 (6th Cir. 1993). The burden then shifts to the nonmoving

party to "set forth specific facts showing that there is a genuine issue for trial."

*Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250 (1986) (quoting Fed. R. Civ. P.

56). When evaluating a motion for summary judgment, the evidence must be viewed

in the light most favorable to the non-moving party. *Adickes v. S.H. Kress & Co.*,

398 U.S. 144, 157 (1970).

A genuine issue exists if the nonmoving party can present "significant

probative evidence" to show that "there is [more than] some metaphysical doubt as

to the material facts." *Moore v. Philip Morris Cos.*, 8 F.3d 335, 339–40 (6th Cir.

1993). In other words, "the evidence is such that a reasonable jury could return a

verdict for the non-moving party." *Anderson*, 477 U.S. at 248; *see also Matsushita

Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986) (concluding that

summary judgment is appropriate when the evidence could not lead the trier of fact

to find for the nonmoving party).

## IV. ANALYSIS

In Counts I and II, Ms. Drerup claims NetJets violated federal and state law

by discriminating against her on the basis of sex. (Am. Compl.) Under federal law, it

is illegal "for an employer . . . to discharge any individual, or otherwise to

discriminate against any individual with respect to his . . . sex." 42 U.S.C. § 2000e-

2(a)(1). Likewise, Ohio law provides that:

> "[i]t shall be an unlawful discriminatory practice . . . [f]or any employer,
> because of . . . sex . . . to discharge without just cause . . . or otherwise to
> discriminate against that person with respect to hire, tenure, terms,
> conditions, or privileges of employment, or any matter directly or
> indirectly related to employment."

Ohio Rev. Code § 4112.02(A). The Sixth Circuit has recognized that "the elements and legal standards for establishing unlawful sex discrimination are the same under" the federal and Ohio state statutes. *Laderach v. U-Haul*, 207 F.3d 825, 828 (6th Cir. 2000); *see Noble v. Brinker Int'l, Inc.*, 391 F.3d 715, 720 (6th Cir. 2004). Accordingly, the Court will address the claims together.

A plaintiff can prove discrimination using either direct or circumstantial evidence. *Kline v. Tenn. Valley Auth.*, 128 F.3d 337, 348 (6th Cir. 1997). In the absence of direct evidence of discrimination, such claims are analyzed under the *McDonnell Douglas* burden-shifting framework. *White v. Baxter Healthcare Corp.*, 533 F.3d 381, 391 (6th Cir. 2008) (citing *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802 (1973), as modified by *Texas Dep't of Cmty. Affairs v. Burdine*, 450 U.S. 248 (1981)). Under this approach, a plaintiff must first establish a *prima facie* case of discrimination. *Burdine*, 450 U.S. at 252–53. Establishing a *prima facie* case creates a rebuttable presumption that the employer engaged in unlawful conduct. *St. Mary's Honor Ctr. v. Hicks*, 509 U.S. 502, 506–07 (1993).

Once the plaintiff has established a *prima facie* case, the burden shifts to the employer to produce a legitimate, non-discriminatory reason for the adverse employment action. *Burdine*, 450 U.S. at 252–53. This burden is not onerous; an employer satisfies its burden if it articulates a valid rationale for its decision. *Hartsel v. Keys*, 87 F.3d 795, 800 (6th Cir. 1996).

If a defendant presents a legitimate, non-discriminatory reason for the employment action, "a plaintiff will survive summary judgment only by raising a

genuine issue of material fact as to whether the proffered reason is in fact a pretext for" unlawful discrimination. *Walcott v. City of Cleveland*, 123 F. App'x 171, 176 (6th Cir. 2005). The ultimate burden of persuasion remains on the plaintiff throughout this analysis. *See Burdine*, 450 U.S. at 253–56.

### A. Ms. Drerup has failed to establish a *prima facie* case because she does not identify a similarly situated comparator.

Ms. Drerup does not provide direct evidence of sex discrimination; therefore, the Court uses the *McDonnell Douglas* burden-shifting framework. *White*, 533 F.3d at 391 (citing *McDonnell Douglas*, 411 U.S. at 802). To establish a *prima facie* case of discrimination, a plaintiff must show (1) she was a member of a protected class, (2) she was qualified for her position, (3) she suffered an adverse employment action, and (4) she was treated differently than a similarly situated employee who was not a member of the protected class. *Id*. The parties dispute prong (4) only. (Mot. PageIDs 194–97; Opp. PageIDs 706–12.)

To show disparate treatment, a plaintiff must demonstrate that she is similarly situated in all relevant respects to the employee to whom she compares herself. *Ercegovich v. Goodyear Tire & Rubber Co.*, 154 F.3d 344, 352 (6th Cir. 1998); *Mitchell v. Toledo*, 964 F.2d 577, 583 (6th Cir. 1992). Plaintiff "need not demonstrate an exact correlation with the employee receiving more favorable treatment in order for the two to be considered 'similarly situated'"; rather "the plaintiff and the employee with whom the plaintiff seeks to compare himself or herself must be similar in 'all relevant aspects.'" *Ercegovich*, 154 F.3d at 352 (citing *Pierce v. Commonwealth Life Ins*. Co., 40 F.3d 796, 802 (6th Cir.1994)). In

11

determining relevance, courts are to "make an independent determination as to the relevancy of a particular aspect of the plaintiff's employment status and the comparator employee." *Id.*

Ms. Drerup compares herself to the three male pilots who were reassigned to the Citation+ because they were unable to safely and comfortably fit in the Phenom based on their measurements during the fit test. She argues that she and "the male comparators were hired to fly the Phenom. Neither Ms. Drerup nor the male comparators were able to fly the Phenom due to their stature. Thus, Ms. Drerup and the male comparators are similarly situated." (Opp. PageID 710; *see also* ECF No. 52-1, PageIDs 726–27.)

NetJets counters that "[b]eing short and being tall are not the same physical characteristics and have different impact on job performance. Differing heights cannot be relied on to argue comparators are similarly situated." (Reply PageID 791.) NetJets argues that Ms. Drerup's only proper comparator "would be a male of similar height to her who had been rated proficient in training, failed a check ride, declined to continue the check ride, refused additional training but was reassigned to another aircraft rather than being terminated." (Mot. PageIDs 196–97.)

Ms. Drerup's comparator argument has some surface appeal: if the male pilots were too tall to fly the Phenom and were reassigned to a different aircraft as a result of their height, Ms. Drerup could have been reassigned when it became apparent that she was too short to fly the Phenom. Below the surface, however, Ms. Drerup has failed to demonstrate that she was similar to those three male pilots in

all relevant respects.

The male pilots she urges the Court to adopt as comparators were reassigned to the Citation+ because of their fit test measurements. Unlike the men, Ms. Drerup "fit" in the Phenom.

Moreover, Ms. Drerup has not presented any evidence that the male pilots struggled during simulator training, failed check rides, declined to continue, and refused additional training. Ms. Drerup struggled significantly to fly the Phenom during simulator training and her check ride—she says so on multiple occasions throughout her opposition memorandum and deposition. (Opp. PageID 702; Drerup Am. Decl. ¶ 55; Drerup Dep. 46:1–3; 64:10–13; 79:6–8; ECF No. 50.)

Thus, Ms. Drerup and her comparators have not "engaged in the same conduct without such differentiating or mitigating circumstances that would distinguish their conduct or the employer's treatment of them for it." *Ercegovich*, 154 F.3d at 352; *see also Lutz v. Ohio Dept. of Rehabilitation and Correction*, No. 2:10-cv-877, 2011 WL 4964977, at *4–5 (S.D. Ohio Oct. 19, 2011) (Frost, J.) (finding plaintiff's comparator was not similarly situated where he was assigned to a post with regular inmate contact and plaintiff had not been).

Not only are her proposed comparators not similarly situated, she makes no effort to explain why she struggled with flying because of her height, but other small-stature female pilots are able to fly the Phenom.

She has failed to identify a similarly situated comparator and has failed to establish her *prima facie* case of discrimination.

**B.     Ms. Drerup cannot show that NetJets' legitimate, non-discriminatory reasons for terminating her employment are mere pretext for discrimination.**

Even assuming *arguendo* that Ms. Drerup has satisfied her *prima facie* burden, Ms. Drerup fails to show that NetJets' stated reasons for termination are mere pretext for discrimination.

NetJets offers the following reasons for terminating Ms. Drerup: (1) she failed her check ride and chose not to continue; (2) she declined the opportunity to receive additional training to help her satisfactorily complete her check ride; (3) there were concerns regarding Ms. Drerup's demeanor during Indoc training; and (4) her flight training record showed she had significant struggles. (Mot. PageID 197.) NetJets' burden is one of production, not persuasion; it "can involve no credibility assessment." *St. Mary's Honor Ctr.*, 509 U.S. at 509. Ms. Drerup does not argue that NetJets has failed to meet its burden (Opp. PageIDs 712–13), and the Court finds that it had legitimate, nondiscriminatory reasons for terminating her employment.

To demonstrate pretext, Ms. Drerup must show that a genuine issue of material fact exists as to whether NetJets' proffered reasons were pretext for discrimination. To do so, she may establish that NetJets' proffered reasons: (1) had no basis in fact; (2) did not actually motivate its action; or (3) were insufficient to motivate its action. *Tingle v. Arbors at Hilliard*, 692 F.3d 523, 530 (6th Cir. 2012) (quoting *Romans v. Mich. Dep't of Human Servs.*, 668 F.3d 826, 839 (6th Cir. 2012)). These three categories are a "convenient way of marshaling evidence and focusing it on the ultimate inquiry: 'did the employer fire the employee for the stated reason or

14

not?'" *Id.*

A jury "may not reject an employer's explanation [of its action] unless there is sufficient basis in the evidence for doing so." *Gray v. Toshiba Am. Consumer Prods., Inc.*, 263 F.3d 595, 600 (6th Cir. 2001) (quotation and citation omitted). Accordingly, to avoid summary judgment, "a plaintiff must produce sufficient evidence from which a jury could reasonably reject [the defendant's] explanation of why it fired her." *Chen v. Dow Chemical Co.*, 580 F.3d 394, 400 (6th Cir. 2009). The evidence must suggest that the employer acted for discriminatory reasons—more than simply revealing "a dispute over the facts upon which the discharge was based." *Braithwaite v. Timken Co.*, 258 F.3d 488, 494 (6th Cir. 2001). "[A]s long as an employer has an honest belief in its proffered nondiscriminatory reason for discharging an employee, the employee cannot establish that the reason was pretextual simply because it is ultimately shown to be incorrect." *Majewski v. Automatic Data Processing, Inc.*, 274 F.3d 1106, 1117 (6th Cir. 2001) (citation omitted); *Occhione v. PSA Airlines, Inc.*, 886 F. Supp. 2d 736, 746 (S.D. Ohio 2012) (rejecting pilot's pretext arguments where airline demonstrated it honestly believed its reason for termination where pilot made numerous errors during and failed check rides).

> When a job requires a small amount of skill and training and the consequences of hiring unqualified applicants are insignificant, the courts should examine closely any pre-employment standards or criteria which discriminate against minorities. In such cases, the employer should have a heavy burden to demonstrate to the court's satisfaction that his employment criteria are job-related. When a job clearly requires a high degree of skill and the economic and human risks involved in hiring an unqualified applicant are great, the employer bears a

15

correspondingly lighter burden to show that his employment criteria are
job-related. . . . The job of airline flight officer is clearly such a job.

*Boyd v. Ozark Air Lines, Inc.*, 568 F.2d 50, 54 (8th Cir. 1977) (citing *Spurlock v.
United Airlines, Inc.*, 475 F.2d 216 (10th Cir. 1972)).

Ms. Drerup offers two arguments in support of pretext: (1) NetJets changed
its rationale for terminating her (Opp. PageIDs 714–15); and (2) NetJets did not
terminate her for the reasons stated (*Id.* PageIDs 715–21).

### 1.  Ms. Drerup has not raised a genuine issue of material fact that NetJets' reasons for termination have shifted in a material way.

Ms. Drerup avers that on or around the time she was terminated, she was
not provided with reasons for her termination but was instead notified by letter that
she failed to successfully complete her probationary period. (Opp. PageIDs 714–15.)
She argues NetJets changed its reasons in its interrogatories when it explained that
she "was terminated because she failed to successfully complete her probationary
period," and the "decision was reached after considering her performance on her
check ride and her attitude and behavior during her probationary period." (*Id.*; ECF
No. 52-1, PageID 726.)

The "shifting explanation" rule Ms. Drerup relies upon only applies "when an
employer's reason for allegedly discriminatory actions change in a *material* way
throughout the stages of litigation." *Marshall v. Belmont Cty. Bd. of Commrs.*, 110
F. Supp. 3d. 780, 793 (S.D. Ohio 2015), *aff'd*, 634 F. App'x 574 (6th Cir.). But here,
NetJets' interrogatory response could reasonably be read as clarifying the type of
behavior that contributed to Ms. Drerup's termination during her probationary

period. *Id.* at 793 (explaining a "generic statement [related to termination] could reasonably be read to encompass [a] press release's proffered reason" for the plaintiff's termination). NetJets' reasons for termination have perhaps become more specific from her termination to today, but they have remained consistent, and Ms. Drerup has failed to identify any material changes.

> ### 2. Ms. Drerup has not raised a genuine issue of material fact that NetJets' proffered reasons did not motivate its actions.

Ms. Drerup attacks the substance of each of NetJets' reasons for termination in turn. First, she asserts NetJets could not have terminated her due to the difficulties she had during simulator training because if that was the reason, NetJets would not have allowed her extra simulator training or to take the check ride. (Opp. PageID 716.) Next, she argues it was pretextual for NetJets to terminate her for her decision to cease the check ride and refuse additional training because "it was not safe for her to fly the Phenom because of her short stature." (*Id.*) Finally, Ms. Drerup contends NetJets did not terminate her because of an attitude problem, offering testimony from other NetJets coworkers that she was professional, respectful, and pleasant. (*Id.* PageID 719.) NetJets replies that "the reasons for Drerup's termination were cumulative, not reasons independent from or alternative to one another." (Reply PageID 796.) Where there are multiple reasons for termination, like here, a plaintiff must cast substantial doubt on a fair number of them in order to show pretext. *Nathan v. Ohio State Univ.*, 984 F. Supp. 2d 789, 801–02 (S.D. Ohio 2013), *aff'd*, 577 F. App'x 544 (6th Cir. 2014). Ms. Drerup does not do so.

First, a reasonable juror could not reasonably reject NetJets' explanation that Ms. Drerup's struggles with simulator training were a factor in its termination decision. Rather, an employer would offer additional training to a pilot struggling during simulator training, but also reasonably factor those struggles into its decision to terminate that pilot. Ms. Drerup has not offered any evidence refuting this reason for termination.

Next, as to Ms. Drerup's arguments that her stature is the reason she did not complete her check ride and additional training, successful completion of a check ride is FAA-mandated. (Queen Dep. 53:15–18.) Flying a plane requires a high degree of skill, and the risks associated with doing so unsuccessfully are extremely high—the loss of human life. *See Boyd*, 568 F.2d at 54. Thus, NetJets' burden to show that its pilot employment criteria are job-related is light. *See id.* Regardless of her excuses, she cannot dispute that she was unable to meet NetJets' requirements for flying the Phenom.

Rather, Ms. Drerup seems to use height as a proxy for gender, asking the Court to infer—without explicitly arguing or offering evidence in support—that NetJets' practice or policy of assigning tall stature pilots to different aircraft prior to simulator training disparately impacts women pilots because there is no similar practice or policy for pilots of short stature.[3] But Ms. Drerup's claims are for disparate treatment, not disparate impact. *Int'l Broth. of Teamsters v. U.S.*, 431

---

[3] The Court takes judicial notice of the fact that men are on average, taller than women. *Body Measurements*, National Center for Health Statistics (May 2, 2022, 10:08am), https://www.cdc.gov/nchs/fastats/body-measurements.htm; Fed. R. Evid. 201.

U.S. 325, 335–36 n.15 (1977) (recognizing two distinct types of discrimination). While Ms. Drerup has presented evidence that her height is the reason she struggled during the engine out maneuver during simulator training and failed her check ride, (Drerup Dep. 66–67; Felton Dep. 26; Drerup Am. Decl. ¶ 46; ECF No. 52-9), there is also evidence on the record indicating she struggled with other maneuvers and her height did not cause or contribute to those difficulties, (ECF No. 50; Drerup Dep. 51:8–16; 51:1–7; 52:2–10; Opp. PageID 191). And her arguments that her stature is the reason that she could not complete her check ride are undermined by the fact that pilots similar in height to Ms. Drerup do and have successfully flown the Phenom. (Eastman Aff. ¶ 5, ECF No. 54-1; Queen Dep. 70:5–6).

As to her final argument that NetJets' reasons did not motivate its decision, showing that some colleagues had differing views than Mr. Eastman and Ms. Krause does not establish pretext. Ms. Drerup has not offered any evidence showing NetJets did not honestly believe Mr. Eastman's and Ms. Krause's assessments that Ms. Drerup's demeanor did not meet the high bar required for a NetJets pilot. *See Majewski*, 274 F.3d at 1117; (Eastman Dep. 10:2–5, 110:1–5; Krause Dep. 8:24–9:1–2, 21:14–20).

Ms. Drerup has not cast "substantial doubt" on NetJets' cumulative reasons for termination and has failed to show NetJets' reasons for termination were pretextual.

### C.   Ms. Drerup's mixed-motive claim is abandoned.

Count I of Ms. Drerup's Amended Complaint alleges "NetJets discriminated against Plaintiff because of her sex in violation of 42 U.S.C. § 2000e-2(a)(1) and/or sex was a motivating factor in Defendant NetJets' decision to terminate Plaintiff's employment in violation of 42 U.S.C. § 2000e-2(m)." The Court interprets this language as also seeking to bring a mixed-motive claim, and the Sixth Circuit has held the *McDonnell Douglas/Burdine* burden-shifting framework does not apply to such a claim. *White*, 533 F.3d at 400. Ms. Drerup did not, however, address this claim in her opposition memorandum. (*See* Opp.)

"When a plaintiff asserts a claim in a complaint but then fails to delineate that claim in her brief in opposition to summary judgment, that claim is deemed abandoned." *E.E.O.C. v. Home Depot U.S.A., Inc.*, No. 4:07CV0143, 2009 WL 395835, at *17 (N.D. Ohio Feb. 17, 2009) (slip op.); *see also Conner v. Hardee's Food Sys.*, 65 Fed. Appx. 19, 2003 WL 932432, at *4 (6th Cir. 2003) (unpublished) (finding that, "[b]ecause Plaintiffs failed to brief the issue before the district court . . . Plaintiffs abandoned their . . . claim."); *Anglers of the Au Sable v. U.S. Forest Serv.*, 565 F. Supp. 2d 812, 839 (E.D. Mich. 2008) ("It is well settled that abandonment may occur where a party asserts a claim in its complaint, but then fails to address the issue in response to an omnibus motion for summary judgment."). Therefore, the Court deems Ms. Drerup's mixed-motive claim abandoned, and NetJets is entitled to summary judgment on this claim.

V.    **CONCLUSION**

For the reasons set forth above, NetJets' Motion for Summary Judgment (ECF No. 45) is **GRANTED**. The Clerk is **DIRECTED** to **TERMINATE** this case from the docket records of the United States District Court for the Southern District of Ohio.


**IT IS SO ORDERED.**

/s/ Sarah D. Morrison
**SARAH D. MORRISON**
**UNITED STATES DISTRICT JUDGE**